# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 07-3738

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

RAY SANNER,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 CR 360—**John F. Grady**, *Judge*.

No. 08-1344

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ADOLFO ORTIZ,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 07 CR 106—**Barbara B. Crabb**, *Chief Judge*.

ARGUED APRIL 3, 2009—DECIDED MAY 14, 2009

Before EASTERBROOK, *Chief Judge*, and EVANS and SYKES, *Circuit Judges*.

EVANS, *Circuit Judge*. For reasons which will become apparent later, we are consolidating these two seemingly unrelated cases for decision.

First to Ortiz. Adolfo Ortiz is a citizen of Mexico who was removed from the United States on two occasions. He never sought permission to reenter the country. However, he did reenter and was charged with illegal reentry into the United States after removal in violation of 8 U.S.C. § 1326(a) and (b)(2). He pled guilty and was sentenced to a term of 77 months in prison, a sentence he now appeals.

The judge determined under the United States Sentencing Guidelines that Ortiz's base offense level was 8; she then adjusted the range to reflect a 16-level increase after she concluded that a prior conviction for false imprisonment constituted a crime of violence under the illegal reentry guideline, U.S.S.G. § 2L1.2(b)(1)(A)(ii). She also awarded a 3-level downward adjustment for acceptance of responsibility. With a criminal history category of VI, the offense level resulted in a guideline range of 77 to 96 months. What Ortiz objects to is the 16-level increase. He contends that the judge erred in concluding that she could look to the plea agreement and the complaint to determine whether he had, in fact, committed a crime of violence. He contends that *United States v. Billups*, 536 F.3d 574 (7th Cir. 2008) (decided after his sentencing), and *Taylor v. United States*, 495 U.S. 575 (1990), prohibit a court from looking beyond the fact of convic-

tion and the statutory definition of the prior offense to determine whether it is a crime of violence.

This is the square-peg-in-the-round-hole problem. Quite naturally, state legislatures do not define their crimes with an eye to the federal sentencing guidelines. The result is that federal judges must often grapple with whether a state crime fits the definitions found in the federal sentencing guidelines. In this case, the relevant guideline says that a crime of violence includes a number of listed offenses (false imprisonment is not among them) "or any other offense under federal, state, or local law that has as an element the use, attempted use, or threatened use of physical force against the person of another." Wisconsin's false imprisonment statute—Wis. Stat. § 940.30—says that whoever "intentionally confines or restrains another without the person's consent and with knowledge that he or she has no lawful authority to do so is guilty of a . . . felony." Contrasting the two, we see that while the guideline requires the use of force, there is no element of force involved in § 940.30. Wisconsin law also defines the term "without consent" as "no consent in fact" or consent given because of the use of "physical violence," or (we simplify here) for various other reasons (trickery, for example) the victim did not understand what she was consenting to. Wis. Stat. § 939.22(48).

Given this definition, the district judge concluded she was faced with an offense which could be committed by either violent or nonviolent means (and ironically, perhaps, while the use of violence seems more serious

than the other methods, it might actually be the easier one to prove). To determine which method Ortiz was convicted of, the judge looked to the plea agreement and the complaint. She found the crime was committed by violent means—"grabbing the victim by the arm, pulling her back into the car while driving at a high rate of speed, leading her to report to police shortly after the incident that she felt threatened." But, as we said, Ortiz argues that the judge should not have looked beyond the elements of the crime set out in § 940.30.

There are limited circumstances in which a judge can look to other documents to determine what crime a defendant was convicted of: "[W]here the statutory elements and the charging documents fail to resolve the issue, we may then look to additional sources, including the written plea agreement, the transcript of the plea colloquy, admissions by the defendant, or comparable judicial records." *Billups*, 536 F.3d at 577. *See also Shepard v. United States*, 544 U.S. 13 (2005).

Putting aside a determination as to when it is proper to look to other documents, we note that simply looking at the elements of the crime as compared to the sentencing guidelines can be a complex undertaking. In *Billups*, we considered whether Wisconsin's false imprisonment statute qualified as a crime of violence under U.S.S.G. §§ 4B1.1(a) and 4B1.2(a). We looked to both § 940.30 itself and the definition of "without consent" in § 939.22(48)(c). We determined that the statute involves "purposeful, aggressive conduct" that presents, and here we quoted from § 4B1.2(a), "a serious potential risk of

physical injury to another." That does not answer the question before us today, however, because "crime of violence" is defined differently under § 4B1.2(a) than it is under § 2L1.2(b)(1)(A)(ii), the guideline relevant to Ortiz's case. The Application Note to the latter section does not include the clause involving a "potential risk" on which we relied so heavily in *Billups*. Rather, it says merely that a crime of violence includes enumerated offenses and an offense "that has as an element the use, attempted use, or threatened use of physical force against the person of another."

It's certainly possible that in some of its manifestations, the Wisconsin statute meets that definition, too. Section 939.22(48)(c) has elements of the use, attempted use, or threatened use of physical force. This is where the district judge found herself when she decided to look to the plea agreement and the complaint to see what Ortiz was convicted of.

Sorting through all of this at a sentencing proceeding is bunglesome, to say the least. And in this case there was no reason to do it. Facing this knotty issue was not only unnecessary, but as we shall explain later, perhaps could just as easily have been avoided altogether. So we pass this issue for consideration in a case where all of this actually matters.

We will come back to Ortiz's case in a moment, but first we will look at the facts of the case against defendant

Sanner[1]—who also objects to his guideline calculations and his sentence. Sanner was involved in a bank robbery. As relevant here, the facts show that the robbery was committed by four men. Sanner was the getaway driver, driving a Chevrolet Malibu that one of the robbers stole. Sanner and the other three robbers drove to a bank in Montgomery, Illinois. Three went into the bank while Sanner waited outside in the car with a walkie-talkie he was to use to warn those inside if any complications arose. Inside the bank, one of the robbers pointed a gun at the branch manager's head while another man robbed the teller drawers. The men could not open the vault and left the bank with only the $7,605 they retrieved from the drawers. Sanner was given between $400 and $500 for his role in the robbery, and the other three robbers split the rest. The Malibu was abandoned but later recovered and returned to its owner. Sanner was indicted for bank robbery, conspiracy to commit bank robbery, and knowingly possessing a firearm in furtherance of a bank robbery. At trial, a jury found him guilty on all counts.

At sentencing, the judge determined that Sanner's base offense level was 20 under U.S.S.G. § 2B3.1. Two points were added under § 2B3.1(b)(4)(B) because the robbers had restrained bank employees; two more points were added under § 2B3.1(b)(1) because the property of a financial institution was taken. Also, the court added the

---

[1] The appeal of one of Sanner's codefendants, Jonathan Gordon, was recently resolved in a nonprecedential order.

value of the stolen car to the amount of money taken from the bank and found that the loss exceeded $10,000, which raised the level one more notch. Sanner's criminal history put him in category II (two levels lower than the probation department had recommended). So with an offense level of 25 and a criminal history category of II, Sanner faced a guidelines sentence between 147 and 162 months. But the judge adjusted the sentence upward because of statements Sanner made at sentencing and in other *pro se* filings. The result was that his sentence was concurrent terms of 60 months and 96 months, respectively, on the conspiracy and bank robbery counts and a consecutive term of 84 months on the firearms count—a total of 180 months.

The issues Sanner raises on appeal are whether the judge committed error when he included the value of the stolen Malibu in the loss calculation under U.S.S.G. § 2B3.1 and when he increased Sanner's sentence based on statements he made during his sentencing hearing.

We will look first to the statements Sanner made at sentencing. He expressed his opinion that he was a "sovereign," not a "person" and was beyond the venue and jurisdiction of the United States government. For that reason, he said, the federal criminal statutes did not apply to him. He said the federal government did not have jurisdiction over crimes committed in the individual states. He also questioned whether the district judge was operating under the authority of the U.S. Constitution and, in fact, whether Title 18 of the United States Code was properly enacted by Congress.

Along the way, he continued to deny responsibility for the robbery. Perhaps somewhat taken aback by Sanner's statements, the judge asked the parties for additional filings addressing the question of what sentence would be sufficient but not greater than necessary to protect the public from further crimes which Sanner might commit, particularly whether he was a danger to the public because of his attitude toward the law. The judge wanted to know specifically whether a sentence above the high end of the guidelines would be necessary. The parties filed responses and the sentencing hearing reconvened a few days later.

At the hearing, the judge expressed his view that to "ignore the way in which this defendant has denigrated the law in a misguided effort to benefit himself somehow would not promote respect for the law." Sanner's statements were seen as a "self-serving effort to come up with something that he could advance in a hopeless quest to win an acquittal somehow in this case" and that he was saying that the "responsibility for his predicament lies with those people who have erroneously charged him with an offense which they have no jurisdiction to charge before a court that has no jurisdiction to adjudicate." Sanner also said he wanted to take paralegal courses in prison, and the judge reasonably assumed that Sanner was likely to assist other inmates in prison and would be "broadcasting these theories to other inmates." While recognizing that no one could prevent Sanner from speaking, the judge felt that what he could do was to impose a sentence reflecting his "very strong disagreement with the defendant's manipulation of legal

authority for his own ends." The judge imposed a sentence 18 months above the guideline range he had calculated (which, as we shall see, Sanner contends was wrong) and above the recommendation of the government.

Relying on *United States v. Clemmons*, 48 F.3d 1020 (7th Cir. 1995) (overruled on other grounds), Sanner's argument is that his right to allocution was undermined because what he said in allocution was used against him. *Clemmons* does not carry the day for him. In fact, in *Clemmons*, decided back when the guidelines were mandatory, we deferred to the district court's judgment that a sentence at the top of the guideline range was warranted.

Considerable thought was given to the effect Sanner's statements should have on his sentence. Between the two sentencing hearings, the judge specifically and independently researched whether reliance on Sanner's statements at sentencing would violate the First Amendment. Determining that it would not, the judge then recited the objectives of sentencing (the § 3553 factors), particularly promoting respect for the law and protecting the public. His reasoning was sound. We find no clear error in the decision that an upward adjustment was necessary under the circumstances of this case.

The other issue Sanner raises involves the adjustment for the value of the stolen car. The guidelines provide for a one-level increase in the offense level if the loss from a robbery is more than $10,000 and up to $50,000. Here, as we have said, the take from the bank was $7,605. At sentencing the judge added to that amount the value of the stolen car, which resulted in the one-level increase.

Sanner objected to the increase on the basis that it was not foreseeable to him that his codefendants would steal a car for use in the robbery and that the increase should be $295, the amount of damage to the car, rather than its Blue Book value, which was $9,200. There was also argument about whether the Blue Book was the appropriate way to value the car. Ultimately, the judge said, all the government had to show was that the loss was over $10,000 and the robbery itself was $7,000, so, he asked, "was that car worth three [thousand dollars]? I think so."

The issue as it is framed on appeal is whether the amount properly included as loss is the value of the car or just the amount of the damage done to the car while it was in the robbers' possession. Sanner argues that *United States v. Donaby*, 349 F.3d 1046 (7th Cir. 2003), stands for the proposition that the damage done to the car is the proper measure.

In *Donaby*, the robbers obtained $47,965. Upon leaving the bank, they stole a van which was parked in front of the bank. The van was worth $34,435 and it was damaged to the tune of $5,189.85. The issue in that case was whether the amount of the damage could be added to the $47,965 taken from the bank to lift the amount of loss over the $50,000 mark. The amount of damage by itself was sufficient to reach the $50,000 threshold for a 2-point upward adjustment, and adding the value of the vehicle would not reach the next threshold which is $250,000 for a 3-level adjustment. In that case, there was no point in considering whether the value of the van would properly have been included as "loss."

We upheld the addition of the repair cost in *Donaby*. Because that was the issue in the case; that was the holding. However, in reaching that result we also expressed our agreement with the Eighth Circuit in *United States v. Powell*, 283 F.3d 946 (2002), which allows the value of a stolen vehicle used during a robbery to be included as loss. In addition, the Application Note to § 2B3.1 seems to allow for the inclusion of either the value of the car or of the damage; it says that loss means the "value of the property taken, damaged, or destroyed." We are in agreement with the dicta in *Donaby* that the value of the car can be included in the calculation of loss.

In Sanner's case, the district judge wisely avoided meaningless arguments about whether the value of the car was $9,000 or $3,000. The additional $6,000 could make no difference in the guideline calculation. There was no point in wasting time on it.

All of which bring us to the reason we have consolidated the *Ortiz* and *Sanner* cases: they illustrate how guideline calculations can sometimes bog a case down—and generate an appeal—even if the end result has little importance in the big picture.

First *Ortiz*. Whether or not his Wisconsin false imprisonment conviction was a crime of violence that permitted a 16-point enhancement to his guideline range (certainly he would have got at least a 4-point kick for "any other felony" or perhaps even an 8-point bump for an "aggravated felony") under 2L1.2(b)(1)(A)(ii) did not have to be decided. Ortiz also had a battery conviction as a habitual offender which is a crime of violence under the guide-

line. Wisconsin Statute § 940.19(1) provides that who-
ever "causes bodily harm to another by an act done with
intent to cause bodily harm to that person or another
without the consent of the person so harmed is guilty of
a Class A misdemeanor." A person convicted as a
habitual offender under Wisconsin Statute § 939.62 has
his penalty increased to no more than 2 years, which
makes it a felony for purposes of U.S.S.G. § 2L1.2. The
judge could have easily increased Ortiz's offense level on
the basis of the battery conviction alone.

But also because the guidelines are advisory, in con-
sidering the § 3553(a) factors, the judge could have
viewed the factual basis for Ortiz's false imprisonment
conviction as an indication that he was a bad guy and
that the public deserved protection from further criminal
acts he might be inclined to commit. The judge could have
said that she had made her best assessment of the guide-
line calculation but that Ortiz's sentence was not depend-
ent on that calculation. She could have said that Ortiz's
actions as evidenced by the facts in the false imprison-
ment case made him both violent and dangerous
because he prevented the victim from leaving a vehicle
by grabbing her arm and yanking her back into the car
twice. He then drove through parking lots and residential
streets at a high rate of speed. He accelerated toward a tree,
swerving at the last moment. Based on this behavior, the
judge could have increased Ortiz's sentence pursuant to
the § 3553(a) factors, regardless of whether the crime
technically fit under U.S.S.G. § 2L1.2(b)(1)(A)(ii) of the
guidelines. When a judge proceeds in this manner, she
must make clear that the § 3553(a) factors drive the sen-

tence without regard as to how the prior conviction fits under a particular guideline. Doing so will make the often nit-picking review of issues like this under our now advisory guideline scheme unnecessary.

In Sanner's case, the issue of the value of the car raises the offense level for the bank robbery from 24 to 25—or from a range of 57 to 71 months to 63 to 78 months, a difference which might be significant to a defendant but, one would hope, be of limited concern to the government. The meaninglessness of the one-point difference is stark in Sanner's case because on this count he was, in fact, sentenced to 96 months due to his lack of respect for the law, an adjustment well beyond his guideline range. It is hard to see, in that circumstance and in cases more difficult than this one, why a district judge should bother with a possibly controversial adjustment which will have no—or little—effect on the sentence. In Sanner's case, even if the value of the car was not used to raise the guideline level a smidgeon, the judge could have considered the § 3553(a) factors and imposed the same sentence. In doing so, however, a judge must make clear that the sentence is based—as this one certainly was—on the § 3553(a) factors.

In both cases, the judgments of the district courts are AFFIRMED.